# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISON

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Cause No. EP:22-CR-0229-KC** |
| | § | |
| **PAOLA CONNELLY,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S AMENDED MOTION TO DISMISS SUPERSEDING INDICTMENT

Comes now, the United States of America, by the United States Attorney for the Western District of Texas, and files this the Government's Response to Defendant's Amended Motion to Dismiss the Superseding Indictment.[1] Defendant alleges that possession of a firearm by an unlawful user of or addicted to a controlled substance in violation of 18 U.S.C. § 922(g)(3) and (d)(3) are unconstitutional and therefore the Court should dismiss the Superseding Indictment pending against her.

The Government would respectfully request the Court deny the Defendant's Motion. Nothing in the Supreme Court's decision in *New York Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), casts doubt on § 922(g)'s constitutionality. *Bruen's* central holding was that a Second Amendment challenge does not call for "means-end" scrutiny (like strict or immediate scrutiny). Under *Bruen*, a gun regulation violates the Second Amendment if (1) the Second Amendment's plain text covers the conduct at issue, unless (2) the government shows that the challenged regulation is consistent with the nation's historical tradition of gun regulation. Notably,

---

[1] On October 21, 2022, the Court mooted the original Motion to Dismiss Indictment (ECF No. 63) after Defendant filed an Amended Moton to Dismiss Indictment (ECF No. 65).

the Supreme Court did not overturn or abrogate its decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), or *McDonald v. Chicago*, 561 U.S. 742 (2010). Rather, the Court explicitly defined the standard set forth in *Heller* and *McDonald* and rejected additions to the *Heller* framework contemplated by lower courts. *Bruen*, 142 S. Ct at *2132–34.

The Supreme Court has long recognized that the Second Amendment is not limitless and that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *McDonald*, 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626). Likewise, the Supreme Court has long recognized the prohibition on the possession of firearms by felons and the mentally ill. *Id.* (citing *Heller*, 554 U.S. at 626–627). The *Bruen* decision does not overturn that longstanding precedent and § 922(g)'s prohibition is not unconstitutional. *See Bruen*, 142 S. Ct. at *2162 (Kavanaugh, J., concurring). Therefore, this Court should deny Defendant's Amended Motion to Dismiss the Superseding Indictment.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

On December 28, 2021, at approximately 9:18am, El Paso Police Department (EPPD) patrol officers were dispatched to a residence in El Paso, Texas, based on a 911 call. The dispatcher advised the EPPD responding officers that there was a conflict between John Connelly (hereinafter J. Connelly), and the victim. The dispatcher advised that J. Connelly was threatening the victim with a machete, demanding the victim to apologize to J. Connelly's wife, the Defendant, Paola Connelly (hereinafter Defendant).

At 9:26 am, the victim called 911 again and advised that J. Connelly was at his front door with a shotgun. A loud bang was heard, and then J. Connelly yelled, "HE JUST SHOT THE FUCKIN' DOOR IN" followed by more loud bangs. When officers arrived, they heard several shots and observed J. Connelly with a shotgun (Mossberg, 12 gauge shotgun, Serial Number

V1237779) firing at the victim's front door. The officers advised they observed the last muzzle flash, but their view of the door was blocked. Officers ordered J. Connelly to drop the firearm and he complied and dropped the shotgun. J. Connelly then tried to make it back to his residence but was taken into custody at his front door.

J. Connelly was found in possession of a second firearm (Glock 19, Serial Number BKZX116) during the initial pat-down. Officers conducted a safety sweep of the residence because they believed that the Defendant, who may have been involved in the incident, was inside the residence.

EPPD officers met with the victim who advised that he and J. Connelly were both veterans and that although they are neighbors, they had only been speaking for approximately two weeks. The victim was later interviewed by ATF Special Agents. The victim admitted that he had previously done cocaine with J. Connelly approximately three days before the incident. He further admitted that he believed J. Connelly had ingested "mushrooms" on the night of December 27th.

During the sweep of the residence, officers detected the strong odor of marihuana throughout the residence. The officers observed what appeared to be a homemade marihuana greenhouse inside the residence which consisted of a plastic enclosed area with pots inside and possible a ventilation unit attached to it. The firearms and ammunition were not secured and were found throughout the residence in common areas where both J. Connelly and Defendant had access.

A search warrant was obtained for the residence. ATF and EPPD executed search warrants on the Connelly residence and located numerous items of drug paraphernalia to include: rolling papers, several empty Tetrahydrocannabinol (THC) extract packages throughout the residence for "wax" and "crumble", baggies and jars with marihuana residue throughout the residence, vape

3

pen, glass pipe, water bongs and a grinder all with marihuana residue. Investigators also located a total of 1.2 grams of marihuana found in different containers in different parts of the house, 27.74 grams of THC edible in the master found in the master bedroom, prescription medication in a baggy, .21 grams of marihuana extract (crumble), and 37.74 gram of suspected psylocibin.

ATF agents also located and seized six firearms in the primary bedroom and one in the living room area, as well as large amounts of ammunition. There was a pistol located between the mattress and nightstand on what appeared to be Defendant's side of the bed next to several items of drug paraphernalia and controlled substances which were located under the bed and in and on the nightstand. The remaining firearms were spread throughout the primary bedroom, mostly on J. Connelly's side of room, with the exception of one firearm which was locked in a safe in the primary bedroom. A trace of the firearms reveals that the bulk were registered to the Defendant.

The Defendant was interviewed by EPPD. She advised that there was an argument between herself and her husband, J. Connelly, over his drug use with their neighbor. The Defendant stated that J. Connelly told her that the victim gave him drugs and he took the drugs. The Defendant said she believed the drugs were crack cocaine.

When asked about drugs within the residence, the Defendant replied, "If weed is drugs, that's it" referring to possible drugs located in their residence. The Defendant said J. Connelly uses marihuana and that he smoked marihuana a couple days prior. The Defendant also said she uses marihuana on a regularly basis to sleep at night and to help her with anxiety.

On March 2, 2022, the Defendant and J. Connelly, were indicted by a grand jury sitting in the Western District of Texas, in a two-count indictment. On August 10, 2022, defendant was charged with two separate counts in a superseding indictment following the Court's order to sever

the cases between the Defendant and J. Connelly.  Now before the Court is the Defendant's amended motion to dismiss the superseding indictment.

## II.     LEGAL BACKGROUND

### A.  18 U.S.C. § 922(g)(3)

Section 922(g)(3) states: "It shall be unlawful for any person who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) . . .  possess in or affecting commerce, any firearm or ammunition . . . ."

Defendant claims that § 922(g)(3) violates the Second Amendment under the framework announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Before *Bruen*, every circuit that considered the issue—including the Fifth Circuit—held that § 922(g)(3) does not violate the Second Amendment. *See United States v. Carter*, 750 F.3d 462, 466–68 (4th Cir. 2014); *United States v. Dugan*, 657 F.3d 998, 999–1000 (9th Cir. 2011); *United States v. Yancey*, 621 F.3d 681, 683–87 (7th Cir. 2010); *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010); *United States v. Patterson*, 431 F.3d 832, 835–36 (5th Cir. 2005); *United States v. May*, 538 F. App'x 465, 466 (5th Cir. 2013); *United States v. Richard*, 350 F. App'x 252, 260 (10th Cir. 2009).

Although *Bruen* made the preexisting Second Amendment standard "more explicit," including by clarifying that the proper analysis focuses on the historical record rather than "means-end" scrutiny, *see* 142 S. Ct. at 2134, *Bruen* does not change the result as to § 922(g)(3). Unlawful drug users and addicts, by definition, fall outside the scope of the Second Amendment's text, which protects only law-abiding, responsible citizens. And, in any event, § 922(g)(3)'s temporary prohibition of gun possession by unlawful drug users and addicts comfortably fits a longstanding historical tradition of disarming groups considered dangerous or unvirtuous.

**A.    Under *Bruen*, a gun restriction violates the Second Amendment only if it burdens conduct covered by the Amendment's text and lacks a historical analogue.**

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment gives law-abiding, responsible citizens a right to keep and bear arms for self-defense. The Court held unconstitutional two District of Columbia laws that effectively banned handgun possession in the home and required all guns in homes to be kept inoperable and so unavailable for self-defense. *Id.* at 628–34.

But the Court emphasized that the Second Amendment right is "not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. "[N]othing in [the *Heller*] opinion [was to] be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (repeating *Heller*'s "assurances" as to "longstanding regulatory measures"). The Court meant its list of "presumptively lawful regulatory measures only as examples," not as exhaustive. *Heller*, 554 U.S. at 627 n.26.

In *Bruen*, the Supreme Court "made the constitutional standard endorsed in *Heller* more explicit." 142 S. Ct. at 2134. It explained: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30.

Applying that standard, the Court held unconstitutional New York's licensing law, which allowed an applicant to obtain a license to carry a gun outside his home only by proving that "proper cause exists." *Id.* at 2123. New York courts had read "proper cause" as "a special need for self-protection distinguishable from that of the general community." *Id.* First, the Court held that

6

the Second Amendment's plain text covered the conduct at issue. *Id.* at 2134–35. The petitioners— "two ordinary, law-abiding, adult citizens"—were undisputedly among "'the people' whom the Second Amendment protects." *Id.* at 2134. And their proposed conduct—"carrying handguns publicly for self-defense"—fell within "the right to keep and bear arms." *Id.*

Second, the Court surveyed historical data from "medieval to early modern England" through "the late-19th and early-20th centuries" to determine whether New York's licensing law squared with historical tradition. *Id.* at 2135–56. After a "long journey through the Anglo-American history of public carry, [the Court] conclude[d] that respondents ha[d] not met their burden to identify an American tradition justifying the State's proper-cause requirement." *Id.* at 2156. "Apart from a few late-19th century outlier jurisdictions," the Court summarized, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense" or required a showing of special need for public carry. *Id.*

**B.    The Second Amendment's text does not cover possession of a firearm by unlawful drug abusers.**

This Court need not consider whether § 922(g)(3) squares with the nation's historical tradition of gun regulation because it burdens no conduct covered by the Second Amendment's plain text. Defendant has the burden at this initial stage of the analysis to show that the Second Amendment covers her conduct. She cannot carry her burden because unlawful drug abusers are, by definition, not "law-abiding" citizens, *see Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635), and thus not among "the people" whom the Second Amendment protects.

**1.    The party challenging a gun regulation has the burden of showing that the Second Amendment's text covers her conduct.**

In *Bruen*, the Supreme Court did not address which party has the burden of showing that the Second Amendment's text covers—and thus "presumptively" protects—the conduct at issue. *See* 142 S. Ct. at 2130. But it implied that the party challenging a gun regulation has that initial burden.

To repeat, the Court's analysis proceeded in two steps: it asked, first, whether the Second Amendment's plain text covers the conduct at issue and, second, whether the regulation squares with the nation's tradition of gun regulation. *See, e.g.*, *id.* at 2126, 2130. At step two, the Court assigned the government the burden of offering historical evidence to support the regulation. *Id.* To do so, the Court analogized to "the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." *Id.* at 2130 (citing *Heller*, 554 U.S. at 582, 595, 606, 618, 634–635). The Court did not say which party has the burden at step one. Nor did it need to since the parties did not dispute that the respondents were among "the people" whom the Second Amendment protects and that publicly carrying handguns for protection fell within "the right to keep and bear arms." *Id.* at 2134.

Continuing the Supreme Court's First Amendment analogy, the party challenging a gun regulation has the burden at step one. Although the government has the burden of justifying a purported restriction on the freedom of speech, the party challenging the restriction must show that the First Amendment right applies in the first place. *See, e.g.*, *Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1147 (10th Cir. 2020) ("Plaintiffs had the initial burden of showing that the First Amendment applies to their conduct." (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 n.5 (1984)); *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) ("The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies."). Likewise here, Defendant has the burden of showing that the Second Amendment applies to—and thus presumptively protects—his conduct.

### 2.  Illegal drug abusers are not among "the people" whom the Second Amendment protects.

Defendant cannot show that the Second Amendment's plain text covers her conduct. *Heller* and *Bruen* defined the right to bear arms as belonging to "law-abiding, responsible" citizens, *Heller*, 554 U.S. at 635; *Bruen*, 142 S. Ct. at 2156, or "ordinary, law-abiding citizens," *Bruen*, 142 S. Ct. at 2122, 2134. For that reason, *Bruen* did not question the constitutionality of "shall-issue"

licensing regimes that "require applicants to undergo a background check or pass a firearms safety course" to ensure that "those bearing arms" are "'law-abiding, responsible citizens.'" *Id.* at 2138 n.9; *see id.* at 2162 (Kavanaugh, J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible"). Thus, *Bruen* does not cast doubt on firearms restrictions that prevent irresponsible, non-law-abiding citizens from possessing firearms.

Anyone who violates § 922(g)(3) is, by definition, not a law-abiding, responsible citizen who enjoys the Second Amendment's protection under *Heller* and *Bruen*. The statute applies only to a person who "is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))." To qualify, a defendant's illegal drug must be both (1) "with regularity and over an extended period of time"; and (2) close in time to the gun possession. *United States v. McCowan*, 469 F.3d 386, 392 (5th Cir. 2006); *see also* 27 C.F.R. § 478.11 (ATF regulation defining "unlawful user" in § 922(g)(3) as a "current user" of a controlled substance in a manner other than as prescribed by a physician, meaning that "the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct"); *United States v. Patterson*, 431 F.3d 832, 839 (5th Cir. 2005) (explaining that cases addressing the § 922(g)(3) require "contemporaneousness and regularity" (collecting cases)). A current and regular illegal drug user can hardly be termed "law-abiding" or "responsible."

In this case, for example, police officers detected the strong odor of marihuana throughout the Connelly's residence. The officers also observed what appeared to be a homemade marihuana greenhouse inside the residence. They also found throughout the residence drug paraphernalia including rolling papers, several empty Tetrahydrocannabinol (THC) extract packages, baggies, and jars with marihuana residue, vape pen, glass pipe, water bongs and a grinder all with marihuana residue. Investigators also located a total of 1.2 grams of marihuana found in different containers,

27.74 grams of THC edible in the primary bedroom, .21 grams of marihuana extract (crumble), and 37.74 gram of suspected psylocibin. Moreover, the Defendant, herself, admitted being a regular "weed" drug user. "[T]he requirement that the drug use and firearm possession be contemporaneous does not literally mean that the defendant must have been ingesting (or under the influence of) a controlled substance at the same time as he possessed the gun." *United States v. Cook*, 970 F.3d 866, 879 (7th Cir. 2020).

*Bruen*'s endorsement of the "shall-issue" schemes that exist in 43 states confirms that § 922(g)(3) does not cover illegal drug abusers. *Bruen*, 142 S. Ct. at 2138 & n.9; *id.* at 2162 (Kavanaugh, J., concurring). A number of those shall-issue schemes specifically exclude from eligibility applicants who meet § 922(g)(3)'s standard. Among Ohio's eligibility criteria, for instance, the applicant must "certify[y] that [he] is not an unlawful user of or addicted to any controlled substance as defined in 21 U.S.C. 802." Ohio Rev. Code § 2923.125(o); *see also* Ark. Code § 5-73-309(7)(A) (requiring that the applicant "[d]oes not chronically or habitually abuse a controlled substance to the extent that his or her normal faculties are impaired"); Miss. Code. § 45-9-101(e) (same).

*Bruen* indicates that these regimes denying the right to carry to drug abusers are constitutional. The Court observed that "these shall-issue regimes, which often require applicants to undergo a background check … , are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). As Justice Kavanaugh explained in his concurrence (joined by the Chief Justice), the shall-issue regimes "are constitutionally permissible" even though they "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible

requirements." *Id.* at 2162 (Kavanaugh, J., concurring); *see id.* ("Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes . . . may continue to do so."). *Bruen* therefore confirms that the right to carry firearms does not extend to illegal drug users. *See United States v. Daniels*, --- F. Supp. 3d ----, 2022 WL 2654232, at *2 (S.D. Miss. 2022) (explaining that "[b]ecause it is concerned with 'unlawful' drug users and addicts, there is some doubt that section 922(g)(3) is textually covered by the Second Amendment," but ultimately rejecting the defendant's Second Amendment challenge based on the historical tradition of analogous regulations).

In sum, because conduct that violates § 922(g)(3) involves contemporaneous and regular violation of the criminal drug laws—and will always show lack of responsibility—people subject to § 922(g)(3) are not "law-abiding, responsible citizens" under *Heller* and *Bruen*. This Court should uphold the statute on that basis and need not consider whether the government can show that the statute is consistent with historical tradition.

C.    **Section 922(g)(3)'s prohibition of firearm possession by illegal drug abusers squares with the nation's historical tradition of gun regulation.**

Even if the Second Amendment's plain text covers Defendant's conduct, her Second Amendment claim fails because § 922(g)(3) "is consistent with the Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2130. The historical record shows a longstanding tradition of categorically restricting the gun rights of groups viewed by legislatures as dangerous or unvirtuous.

Section 922(3)(3) is sufficiently analogous to those historical restrictions to pass constitutional muster. The constitutional question is not whether § 922(g)(3)'s restriction has existed since the founding. Rather, courts considering present-day gun regulations must "reason[] by analogy." *Id.* at 2132. "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphasis

original); *see also Nat'l Rifle*, 700 F.3d at 196 ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue"). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.

**a.** The government has always categorically restricted the gun rights of some groups to promote public safety. In England, officers of the Crown could "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662). And "the act of 'going armed to terrify the King's subjects' was 'a great offence at the common law'" if it was committed with "evil intent or malice." *Bruen*, 142 S. Ct. at 2141 (brackets and emphasis omitted) (quoting *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686)). Thus, "by the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020); *see id.* at 259–61 (detailing history).

Likewise, "[t]he historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations were on the books." *Nat'l Rifle*, 700 F.3d at 200. The colonies (and later the states) passed laws that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 142

S. Ct. at 2145.[2] As *Bruen* observed, those statutes "all but codified the existing common law in this regard." *Id.* at 2144 n.14 (citing George Webb, The Office and Authority of a Justice of Peace 92 (1736)).

Early colonial regulations also "included safety laws … disarming certain groups and restricting sales to certain groups." *Nat'l Rifle*, 700 F.3d at 200. "For example, several jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation." *Id.*; *see also Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019) (explaining that "during the revolution, the states of Massachusetts and Pennsylvania confiscated weapons belonging to those who would not swear loyalty to the United States"); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157–60 (2007); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506–08 (2004); Joyce Lee Malcolm, To Keep and Bear Arms 140–41 (1994).

Historical accounts confirm the founders' attitudes towards disarming potentially dangerous groups. "*Heller* identified … as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting 554 U.S. at 604). That report recognized that the government could disarm potentially dangerous or irresponsible people, stating that "citizens have a personal right to bear

---

[2] *See, e.g.*, Acts and Laws of His Majesty's Province of New Hampshire in New England 17 (1771) (statute enacted 1701); Collection of All Such Acts of the General Assembly of Virginia 33 (1794) (statute enacted 1786); 2 Laws of the Commonwealth of Massachusetts, from November 28, 1780 to February 28, 1807 p. 653 (1807) (statute enacted Jan. 29, 1795); A Compilation of the Statutes of Tennessee of a General and Permanent Nature, from the Commencement of the Government to the Present Time 99–100 (1836) (statute enacted 1801).

arms 'unless for *crimes committed, or real danger of public injury*.'" *Id.* (emphasis added) (quoting 2 Bernard Schwarz, The Bill of Rights: A Documentary History 662, 665 (1971)). Similarly, Samuel Adams offered an amendment at the Massachusetts convention to ratify the Constitution, recommending "that the said Constitution be never construed to authorize Congress … to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." Schwarz, The Bill of Rights 674–75, 681 (emphasis added). Thomas M. Cooley's 1868 treatise, which *Heller* described as "massively popular," 554 U.S. at 616, later explained that some classes of people were "almost universally excluded" from exercising certain civic rights like gun rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 29 (1st ed. 1868).

Indeed, "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *Yancey*, 621 F.3d at 684–85 (quoting *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (collecting scholarly sources)); *United States v. Carpio-Leon*, 701 F.3d 974, 979–80 (4th Cir. 2012) (same). The Second Amendment thus incorporates "a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible" and "'does not preclude laws disarming the unvirtuous (i.e. criminals).'" *United States v. Bena*, 664 F.3d 1180, 1183–84 (8th Cir. 2011) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)); *see also United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as … limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." (quoting Saul Cornell,

*"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002))).

**b.** A parallel and equally longstanding tradition views intoxication as a condition rendering firearm possession dangerous, and accordingly restricting the firearms rights of those who become intoxicated. In 1655, Virginia prohibited "shoot[ing] any gunns at drinkeing." Act XII of March 10, 1655, 1655 Va. Laws 401, 401–02. In 1771, New York prohibited firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages ... frequently done on [those days] by persons . . . being often intoxicated with Liquor.'" *Heller*, 554 U.S. at 632 (quoting Ch. 1501, 5 Colonial Laws of New York 244–46 (1894)).

In the era following ratification of the Fourteenth Amendment in 1868, which extended the Second Amendment to the states, *see McDonald v. City of Chicago*, 561 U.S. 742 (2010), many states enacted statutes prohibiting intoxicated persons from possessing, using, or receiving firearms. *See, e.g.*, Kansas Gen. Stat., Crimes & Punishments § 282 (1868) (providing that "any person under the influence of intoxicating drink" may not "carr[y] on his person a pistol … or other dangerous weapon"); 1878 Miss. Laws 175–76 § 2 (making it unlawful to sell pistols and certain knives to a "person intoxicated"); 1883 Mo. Laws 76, § 1 (prohibiting carrying a dangerous weapon "when intoxicated"); 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329 § 3 ("It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver."); 1890 Okla. Sess. Laws 495, art. 47, § 4 (officers may not "carry[] … arms while under the influence of intoxicating drinks"); 1899 S.C. Acts 97, No. 67, § 1 (forbidding "boisterous conduct" while "under the influence of intoxicating liquors," including "discharg[ing] any gun" near a public road); *see also State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) (upholding Missouri statute as "a reasonable regulation of the use of such arms"). The historical

tradition embodied by these laws continues today, with most states "restrict[ing] the right of habitual drug abusers or alcoholics to possess or carry firearms." *Yancey*, 621 F.3d at 684 (collecting statutes).

**c.** The Supreme Court has recognized the historical tradition of disarming unvirtuous or dangerous citizens. In *Heller*, it endorsed "longstanding prohibitions on the possession of firearms by felons and the mentally ill," among others. *Heller*, 544 U.S. at 626–27. The Court "identif[ied] these presumptively lawful regulatory measures only as examples; [its] list d[id] not purport to be exhaustive." *Id.* at 627 n.26. In *McDonald*, the Court reiterated that *Heller* "did not cast doubt on" those "longstanding regulatory measures." *McDonald*, 561 U.S. at 786. Likewise, nothing in *Bruen* casts doubt on those longstanding regulations. *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) (explaining that the Court's decision "does not expand the categories of people who may lawfully possess a gun"); *id.* at 2162 (Kavanaugh, J., concurring) (reiterating *Heller*'s statements).

Courts relying on this "'virtuous citizen' theory" have upheld "modern laws banning the possession of firearms by illegal aliens and juveniles—classes of people who might otherwise show, on a case-by-case basis, that they are not particularly dangerous." *Medina*, 913 F.3d at 159. In *National Rifle*, this Court rejected a Second Amendment challenge to § 922(b)(1) and (c)(1), which restrict the ability of people under 21 to buy handguns, calling that restriction "firmly historically rooted." 700 F.3d at 204. The court explained that the regulation "is consistent with a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of

public safety." *Id.* at 203.[3] Courts have reasoned similarly for other categorical restrictions similar to *Heller*'s nonexhaustive list of presumptively lawful regulations. *See, e.g.*, *Bena*, 664 F.3d at 1184 (holding that § 922(g)(8)'s prohibition of gun possession by people under domestic-violence protective orders "is consistent with a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens"); *Skoien*, 614 F.3d at 640 (same for § 922(g)(9)'s prohibition of gun possession by those convicted of misdemeanor crimes of domestic violence); *Rene E.*, 583 F.3d at 16 (rejecting a Second Amendment challenge to § 922(x), which restricts the ability of people under 18 to possess handguns, and explaining "that the founding generation would have regarded such laws as consistent with the right to keep and bear arms").

**d.** The same historical tradition readily sustains the modern-day prohibition of firearm possession by unlawful drug users and addicts. Both before and since *Bruen*, courts have described § 922(g)(3)'s prohibition as consistent with this longstanding tradition. For instance, although the Eighth Circuit ultimately granted relief in part on a means-end inquiry that *Bruen* abrogated, it also found "that § 922(g)(3) is the type of longstanding prohibition on the possession of firearms that *Heller* declared presumptively lawful." *Seay*, 620 F.3d at 925 (cleaned up). Similarly, in rejecting a Second Amendment challenge to § 922(g)(3), the Seventh Circuit explained that widespread restrictions on the gun rights of habitual drug users and alcoholics "are merely the

---

[3] *Bruen* abrogated *National Rifle* to the extent that it held that a gun regulation could survive a Second Amendment challenge under means-end scrutiny, even if it is not consistent with the nation's historical tradition of gun regulation, and to the extent that it upheld § 922(b)(1) and (c)(1) under the means-end step of the analysis. *See* 142 S. Ct. at 2127 n.4. But this Court was "inclined to uphold the challenged federal laws at step one of our analytical framework," *see Nat'l Rifle*, 700 F.3d at 204, which relied on the historical record and was "broadly consistent with *Heller*," *see Bruen*, 142 S. Ct. at 2127. Nothing in *Bruen* abrogates this Court's or other courts' historical analyses, which were typically considered part of "step one" of courts' pre-*Bruen* case law.

latest incarnation of the states' unbroken history of regulating the possession and use of firearms dating back to the time of the amendment's ratification." *Yancey*, 621 F.3d at 686. Those courts' historical analyses survive *Bruen*. Indeed, in the only post-*Bruen* decision addressing a Second Amendment challenge to § 922(g)(3) to date, the court found "that the analysis in *Yancey* demonstrates the historical attestation demanded by the *Bruen* framework. *Daniels*, 2022 WL 2654232, at \*4. It thus ruled that § 922(g)(3) squares with an "American legal tradition" of "analogous statutes which purport to disarm persons considered a risk to society—whether felons or alcoholics." *Id.*

Like the age-based regulation addressed in *National Rifle* and other analogous categorical regulations, § 922(g)(3) "is consistent with a longstanding tradition of targeting select groups' ability to access … arms for the sake of public safety." *See* 700 F.3d at 203. "Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people." *Yancey*, 621 F.3d at 683 (citing *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 n.6 (1983)). Thus, "in passing § 922(g)(3), Congress expressed its intention to keep firearms out of the possession of drug abusers, a dangerous class of individuals." *Seay*, 620 F.3d at 925. And one can hardly question Congress's judgment that unlawful drug abusers are, as a class, presumptively dangerous. *See, e.g.*, *Carter*, 750 F.3d at 467–69 (discussing empirical data tying drugs to gun violence); *Yancey*, 621 F.3d at 685–86 (explaining that habitual drug users "are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms" and noting that "[a]mple academic research confirms the connection between drugs and violent crime"). Section 922(g)(3) thus reflects a permissible legislative judgment consistent with historical tradition. Even still, its *temporary* prohibition on possession imposes a far lesser burden than the permanent ban on possession by other groups, like convicted felons. *See Yancey*, 621 F.3d at 686–87.

Contrary to Defendant's argument, it does not matter that a 1968 law created the modern federal restriction on possession of firearms by unlawful drug abusers. Indeed, § 922(g)(1)'s "prohibition[] on the possession of firearms by felons"—which *Heller* expressly endorsed—has a similar historical pedigree. *See* 544 U.S. at 626–27. The federal felon-in-possession law too is "of mid-20th century vintage." *Nat'l Rifle*, 700 F.3d at 196. It "was not enacted until 1938, was not expanded to cover non-violent felonies until 1961, and was not re-focused from receipt to possession until 1968." *Id.*; *see also Skoien*, 614 F.3d at 640 (noting that the "first federal statute disqualifying felons from possessing firearms was not enacted until 1938"). That same 1968 enactment created § 922(g)(3)'s restrictions on drug abusers. *See Yancey*, 62 F.3d at 683 (citing Gun Control Act of 1968, Pub. L. 90-618, § 102, 82 Stat. 1213, 1220). *Heller*'s point in endorsing felon-in-possession laws was not that they had existed in their modern form since the founding but that they were *analogous enough* to historical regulations to be deemed "longstanding." *See* 544 U.S. at 626–27. So too with § 922(g)(3)'s restriction on drug abusers.

Furthermore, the same reasoning applies to § 922(d)(3). Under the statute, it is "unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person is an unlawful user of or addicted any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)). In essence, it is a less direct way to restrict gun access to drug users. Also, under the first *Bruen* step, the Second Amendment protects only the rights to possess and carry guns, not the right to dispose of them in any particular way; thus, § 922(d)(3) covers conduct falling well outside the scope of the Second Amendment's text.

The history of firearms regulations discussed above, show that prohibition on the right to carry or possess a firearm were not solely leveled against the dangerous or violent, but also those

that were irresponsible. The government has an interest in preventing "non-violent" offenders from possessing a firearm because even recklessness or negligence with a firearm could lead to great harm. The third Circuit's decision in *Binderup v. Att'y General United States of America*, 836 F. 3d 336 (3rd Cir. 2007) – which is not binding on this Court – supports the proposition that the government has an interest in disarming violent and non-violent offenders. *Id.* at 348-49.

    **D.**    **Sections 922(g)3 and 922(d)(3) Do Not Violate Defendant's Due Process Rights because the Statutes are Not Unconstitutionally Vague, Facially and As Applied.**

Defendant argues §§ 922(g)(3) and 922(d)(3) violate her rights under the Fifth Amendment because "both statutes fail to define what it means to be an addict or one who unlawfully uses a controlled substance thereby creating a number of vagueness problems under both [sections]."[4]

The Fifth Circuit has addressed such claim of unconstitutional vagueness in § 922(g)(3) on more than one occasion. *United States v. Patterson*, 431 F.3d 832 (5th Cir. 2005) (collecting cases). The Circuit noted that "a criminal statute is not unconstitutionally vague 'if it defines the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Patterson*, 431 F.3d at 836 (*citing United States v. Edwards*, 182 F.3d 333, 335 (5th Cir. 1999) *quoting United States v. Gray*, 96 F.3d 769, 776 (5th Cir. 1996)). The Fifth Circuit also noted that "'when a vagueness challenge does not involve First Amendment freedoms, [this court] examine[s] the statute only in light of the facts of the case at hand.'" *Id*. Thus, in the *Patterson* case, the Fifth Circuit opined that the statute was not vague merely because the term "unlawful user" was not defined. Rather the Court held that "an ordinary person would understand that [defendant's] actions establish him as an unlawful user. He admitted that he regularly used marijuana . . . ." *Id.*

---

[4] Def. Amended Mot., ECF No. 65, pg. 11

Hence, in this instance, the odor of marihuana, drug paraphernalia, the quantities of illicit drugs found throughout the residence, a homemade marihuana greenhouse, and the Defendant's own admission of "weed" use establish both possession of marihuana and a pattern of use. In addition, contrary to Defendant's claim that she was not given fair notice under the statutes, the facts of this case prove otherwise. "The facts of this case establish beyond doubt that Purdy's drug use, like that of Ocegueda, was sufficient to put him on notice that he fell within the statutory definition of 'unlawful [drug] user." *United States v. Purdy*, 264 F.3d 809, 812 (9th Cir. 2001). Thus, the evidence found in Defendant's residence as well as her own admissions provide sufficient notice that she fell within the statutory definition of an unlawful drug user and within the statute's prohibited class.

Moreover, the Defendant's claim that the ". . . continued attempts to judicially define or salvage § 922(g)(3) are not only proving to be futile, they are an unconstitutional violation of the Separation of Powers Doctrine"[5] is without merit because challenges based on vagueness have not been successful. Rather courts have concluded that the statute "give[s] ordinary people fair warning about what the law demands of them." *United States v. Davis*, 139 S.Ct. 2319, 2323 (2019).

## CONCLUSION

For the reasons stated above, the government urges the Court to deny Defendant's Amended Motion to Dismiss the Superseding Indictment.

---

[5] Def. Amended Mot., ECF No. 65, pg. 20-21.

Respectfully submitted,

ASHLEY C. HOFF
UNITED STATES ATTORNEY

By:    *Patricia Aguayo*
_____
PATRICIA AGUAYO
Assistant U.S. Attorney
Texas Bar #24059359
700 E. San Antonio, Suite 200
El Paso, Texas 79901
(915) 534-6884

## CERTIFICATE OF SERVICE

I certify that on this, the 4th of November 2022, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will serve all parties of record.

*Patricia Aguayo*
_____
PATRICIA AGUAYO
Assistant United States Attorney