**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CAUSE NO. EP-22-CR-229(2)-KC |
| | § | |
| (2) PAOLA CONNELLY | § | |

**<u>ORDER</u>**

On this day, the Court considered Defendant Paola Connelly's Motion for

Reconsideration, ECF No. 86.  For the reasons set forth below, the Motion for Reconsideration is

**GRANTED**.

**I.      BACKGROUND**

**A.      Factual background**

On December 28, 2021, the El Paso Police Department ("EPPD") responded to an

emergency call placed by Connelly's neighbor.[1]  Compl. ¶¶ 5–7, ECF No. 3.  When the police

arrived, they heard several shots and observed Connelly's husband standing at his neighbor's

door with a shotgun.  *Id.* ¶ 6.  EPPD officers then arrested Connelly's husband and conducted a

protective sweep of Connelly's house, during which the officers saw several firearms, "observed

what appeared to be a homemade marihuana greenhouse," and "detected the strong [odor] of

marihuana."  *Id.* ¶¶ 8–9.  A subsequent search by officers from EPPD and the Bureau of Alcohol,

Tobacco, Firearms, and Explosives ("ATF") allegedly uncovered 1.2 grams of marijuana, 0.21

grams of marijuana extract, 27.74 grams of "THC edible," 37.74 grams of suspected psilocybin,

and "numerous items of drug paraphernalia."  *Id.* ¶ 12.  ATF officers also located multiple

firearms and ammunition during their search of Connelly's house.  Resp. Opp'n Def.'s Mot.

---

[1] The Court recites the facts alleged by the Government for context only.  It makes no finding as to their veracity.

Dismiss ("Resp.") 4, ECF No. 71.  Several of these firearms were registered to Connelly.  *Id.*; *see also* Superseding Indictment 3–4, ECF No. 44 (listing weapons and ammunition possessed).

Shortly after the incident involving her husband, Connelly informed the officers on the scene that her husband had been "smoking crack" recently, and that he had used cocaine with his neighbor the night before.  Compl. ¶ 10.  Connelly later confirmed this account in a recorded interview with EPPD officers.  *Id.* ¶ 11; Resp. 4.  When asked about her drug use, Connelly told investigators that she uses marijuana on a regular basis "to sleep at night and to help her with anxiety."  Resp. 4.

Based on these facts, Connelly was indicted with one count of possession of a firearm by an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3).  Superseding Indictment 1–2.  Connelly was also indicted with one count of transferring a firearm and ammunition to her husband, an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(d)(3).  *Id.* at 2–3.

> **B.    Procedural history**

Connelly moved to dismiss her indictment, arguing that § 922(g)(3) and (d)(3) violated the Second Amendment and the Due Process Clause of the Fifth Amendment.  Def.'s Am. Mot. Dismiss Indictment ("Mot. Dismiss") 1, ECF No. 65.  On December 21, 2022, the Court denied Connelly's Motion to Dismiss because Fifth Circuit precedent precluded both of Connelly's arguments.  Order 6–9, ECF No. 81.

On February 3, 2023, Connelly moved for reconsideration of the Court's Order in light of the Fifth Circuit's decision in *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023).[2]  Mot.

---

[2] Connelly's Motion for Reconsideration cites the *Rahimi* panel opinion issued on February 2, 2023.  *See* Mot. Recons. 1; *United States v. Rahimi*, 59 F.4th 163 (5th Cir. 2023).  The same Fifth Circuit panel later

Recons. 1–2.  In response, the Government moved to hold the case in abeyance while it sought

further review of *Rahimi*.  Mot. Hold Case in Abeyance ("Abeyance Mot.") 1–2, ECF No. 88.

Connelly opposed the Abeyance Motion on speedy trial grounds.  *See* Resp. Abeyance Mot. 1–3,

ECF No. 89.  The Court denied the Abeyance Motion, Feb. 21, 2023, Text Order, and neither

party has filed anything further regarding the Motion for Reconsideration.

## II.    STANDARD

### A.    Motion for Reconsideration

"Although the Federal Rules of Criminal Procedure do not explicitly authorize motions

for reconsideration, district courts possess continuing jurisdiction over criminal cases and are

free to reconsider their earlier decisions."  *United States v. CITGO Petroleum Corp.*, 908 F.

Supp. 2d 812, 820 (S.D. Tex. 2012) (citing *United States v. Scott*, 524 F.2d 465, 467 (5th Cir.

1975)).  "Absent specific guidance from the Federal Rules of Criminal Procedure," courts should

look to civil suits for guidance about when reconsideration is appropriate.  *Id.* (citing *United

States v. Rollins*, 607 F.3d 500, 502 (7th Cir. 2010)).  And courts regularly reconsider civil orders

when the parties "bring an intervening change in the controlling law to the Court's attention."

*United States v. Quiroz*, --- F. Supp. 3d ----, 2022 WL 4352482, at *2 (W.D. Tex. Sept. 19, 2022)

(citing *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 567–68 (5th Cir. 2003)).

### B.    Motion to Dismiss

Federal Rule of Criminal Procedure 12 allows a party to "raise by pretrial motion any

defense, objection, or request that the court can determine without a trial on the merits."  Fed. R.

Crim. P. 12(b)(1).  These include motions that allege "a defect in the indictment," including

"failure to state an offense."  Fed. R. Crim. P. 12(b)(3)(B)(v).  A court may rule on a pretrial

---

withdrew this opinion and substituted the March 2 *Rahimi* opinion in its place.  *Rahimi*, 61 F.4th at 448.
Unless otherwise noted, all references to *Rahimi* in this order refer to the March 2 opinion.

motion to dismiss an indictment when the alleged infirmity "is essentially one of law." *United States v. Guthrie*, 720 F. App'x 199, 201 (5th Cir. 2018) (quoting *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011)).

## III.   ANALYSIS

### A.     Whether the Motion is appropriate for pretrial resolution

As a preliminary matter, the Court considers whether the Motion to Dismiss, as re-urged in the Motion for Reconsideration, can be properly considered at this stage of the proceedings. "The propriety of . . . dismiss[ing] an indictment . . . by pretrial motion is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact." *Fontenot*, 665 F.3d at 644 (quoting *United States v. Flores*, 404 F.3d 320, 324 (5th Cir. 2005), *abrogated on other grounds by Abramski v. United States*, 573 U.S. 169, 191 (2014)). "If a question of law is involved, then consideration of the motion is generally proper." *Id.* (quoting *Flores*, 404 F.3d at 324).

Neither party has conceded the extent to which Connelly or her husband used various controlled substances. *Compare* Resp. 4 (noting the presence of suspected psilocybin in Connelly's house and discussing her husband's alleged use of cocaine), *with* Def.'s Reply to United States' Resp. ("Reply") 2, ECF No. 74 ("The only undisputed evidence is that Ms. Connelly stated to officers that she sometimes smoked 'weed' to help her go to sleep at night."). The Court declines to make a factual finding on the extent of Connelly's drug use, since such a finding is "inevitably bound up with evidence about the alleged offense itself," and therefore should be made by a jury. *See United States v. Turner*, 842 F.3d 602, 605 (8th Cir. 2016) (citing *United States v. Grimmett*, 150 F.3d 958, 962 (8th Cir. 1998)); *see also Flores*, 404 F.3d at 325 (noting that motions may be resolved pretrial only if they can be determined "without a trial of

the general issue"). But even if Connelly and her husband used controlled substances to the extent alleged by the Government, the Court would find § 922(g)(3) and (d)(3) unconstitutional for the reasons discussed below. Therefore, because the Court can decide the legal issues presented without further factual findings, it assumes without deciding that the Government's drug use allegations are true. After resolving these factual disputes in the Government's favor, the remaining questions are purely legal ones, appropriate for consideration at this stage of the proceedings. *See United States v. Valencia*, No. 5:17-CR-882-DAE(1)(2), 2018 WL 6182755, at *2 (W.D. Tex. Nov. 27, 2018) (collecting cases).

### B.  The impact of *Bruen* and *Rahimi* on *May* and *Patterson*

In its previous Order, the Court held that *United States v. Patterson*, 431 F.3d 832 (5th Cir. 2005), and *United States v. May*, 538 F. App'x 465 (5th Cir. 2013), foreclosed Connelly's Motion to Dismiss her indictment on Second Amendment grounds. Order 6–7. Now, Connelly argues that *Rahimi* has rendered these precedents obsolete, enabling this Court to evaluate her Second Amendment argument under the standard set forth by *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). Mot. Recons. 1–2.

*May* and *Patterson* both assessed and upheld the constitutionality of § 922(g)(3) as applied against marijuana users. *See May*, 538 F. App'x at 465–66; *Patterson*, 431 F.3d at 835–36. Connelly argued that the Supreme Court's decision in *Bruen* implicitly overruled these cases. Reply 1. The Court disagreed, holding that *Bruen* did not clearly abrogate either precedent. Order 7. "Though they are light on detail," the Court reasoned, "both *May* and *Patterson* purport to apply the historical analysis that *Bruen* requires." *Id.* (first citing *May*, 538 F. App'x at 466 (collecting cases); and then citing *Patterson*, 431 F.3d at 835–36). And in any event, the Court declined to determine "whether or how *Bruen* ha[d] changed Fifth Circuit

5

precedents interpreting § 922; that question must be settled by the Fifth Circuit itself." *Id.* (citing *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 789 (5th Cir. 2021)).

Just over one month after the Court's Order, the Fifth Circuit settled that very question in *Rahimi*. *See* 61 F.4th at 450–51. In that case, Rahimi raised a Second Amendment challenge to 18 U.S.C. § 922(g)(8), which makes it a felony to possess a firearm while subject to a domestic violence restraining order. *Id.* at 449–50. Rahimi initially acknowledged that Fifth Circuit precedent foreclosed his argument, but he later argued that *Bruen* overruled that precedent. *Id.* The Fifth Circuit agreed. *See id.* at 450. Even though *Bruen* did not directly address § 922(g)(8), the *Rahimi* court held that "*Bruen* clearly 'fundamentally change[d]' our analysis of laws that implicate the Second Amendment . . . rendering our prior precedent obsolete." *Id.* at 450–51 (quoting *Bonvillian*, 19 F.4th at 792). The *Rahimi* court went on to apply *Bruen*'s standard to § 922(g)(8) directly, without discussing pre-*Bruen* precedent. *See id.* at 454–61.

Though it did not mention *May* or *Patterson* specifically, the Court finds that *Rahimi* recognized the abrogation of those precedents as well. *Rahimi* did not confine its reasoning to cases involving § 922(g)(8); it held that *Bruen* rendered the Fifth Circuit's prior Second Amendment precedent obsolete without qualification. *See id.* at 450–51. Moreover, the two cases that *Rahimi* specifically disavowed contained more historical analysis than *May* and *Patterson* do. *Compare United States v. McGinnis*, 956 F.3d 747, 756–58 (5th Cir. 2020); *and United States v. Emerson*, 270 F.3d 203, 236–60 (5th Cir. 2001), *with May*, 538 F. App'x at 466; *and Patterson*, 431 F.3d at 835–36. And *Patterson*'s analysis relied heavily on an analogy between drug users and those subject to domestic restraining orders, citing a case that *Rahimi* would later expressly disclaim. *See Rahimi*, 61 F.4th at 450–51 (overruling *Emerson*, 270 F.3d 203); *Patterson*, 431 F.3d at 835–36 (citing *Emerson*, 270 F.3d at 261). If *Bruen* changed the

6

analysis of Second Amendment challenges to the point where *McGinnis* and *Emerson* cannot stand, it follows that *May* and *Patterson* are no longer good law either.  And because it nullified the basis for the Court's prior Order, *Rahimi* constitutes an intervening change in the law warranting reconsideration.  *See Quiroz*, 2022 WL 4352482, at *2.

C.     ***Bruen*'s two-step framework**

The Court must follow *Rahimi*'s example and apply the standard set forth in *Bruen* without resort to the Fifth Circuit's pre-*Bruen* precedent.  *See Rahimi*, 61 F.4th at 451.  This analysis proceeds in two steps.  First, the Court must "determine whether 'the Second Amendment's plain text covers an individual's conduct.'"  *Id.* at 453 (quoting *Bruen*, 142 S. Ct. at 2129–30 (alteration omitted)).  "If so, then the 'Constitution presumptively protects that conduct,' and the Government 'must justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'"  *Id.* (quoting *Bruen*, 142 S. Ct. at 2130).  "To carry its burden, the Government must point to 'historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation.'"  *Id.* at 454 (quoting *Bruen*, 142 S. Ct. at 2131–32 (alterations in *Rahimi*)).

D.     **Scope of "the people" covered by the Second Amendment**

Before analyzing whether Connelly's conduct falls within the scope of the Second Amendment at step one of the *Bruen* framework, the Court must consider whether Connelly as an individual can claim protection under the Second Amendment.  The Government contends that the Second Amendment only protects "law-abiding, responsible citizens," and that Connelly does not fall within this group because of her alleged drug use.  *See* Resp. 7–11.  Connelly

7

responds that the Second Amendment protects all "members of the political community."  Reply 2.[3]

    *Rahimi* discussed this argument and generally adopted Connelly's view.  *See* 61 F.4th at 451–53.  *Rahimi* observed that "the words 'the people' in the Second Amendment have been interpreted throughout the Constitution to 'unambiguously refer[] to all members of the political community, not an unspecified subset.'"  *Id.* at 451 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008)).  And the opinion rejected the argument that "non-law-abiding" people could be excluded from the Second Amendment's scope, reasoning that such an interpretation of the Amendment "admits to no true limiting principle."  *Id.* at 453.  The Fifth Circuit thus concluded that "Rahimi, while hardly a model citizen, is nonetheless among 'the people' entitled to the Second Amendment's guarantees, all other things equal."  *Id.*

    But *Rahimi* also appears to leave open the possibility that certain groups of people may be categorically excluded from the Second Amendment's protection.  The opinion explains that the Supreme Court's references to "law-abiding," "responsible," or "ordinary" citizens were only meant "to exclude from the Court's discussion groups that have historically been stripped of their Second Amendment rights, i.e., groups whose disarmament the Founders 'presumptively' tolerated or would have tolerated."  *Id.* at 452 (citing *Heller*, 554 U.S. at 627 n.26).  The opinion continues:

> Rahimi did not fall into any such group at the time he was charged with violating § 922(g)(8), so the "strong presumption" that he remained among "the people" protected by the amendment holds. . . .  [W]hile he was *suspected* of other criminal conduct at the time, Rahimi was not a convicted felon or otherwise subject to another "longstanding prohibition[ ] on the possession of firearms" that would have excluded him.

---

[3] In its previous Order, the Court assumed without deciding that Connelly and her alleged conduct fell within the scope of the Second Amendment, because her request for dismissal was foreclosed by *May* and *Patterson*, regardless.  *See* Order 3 n.2.

*Id.* (emphasis in original) (quoting *Heller*, 554 U.S. at 626–27). *Rahimi* thus suggests that if an individual belongs to a group that has long been prohibited from possessing firearms, the Second Amendment may not protect that individual at all, even if their conduct would otherwise fall within its scope. *See also id.* at 464 (Ho, J., concurring) ("[T]he government can presumably disarm dangerous convicted felons, whether they're incarcerated or not, without violating the Second Amendment.").

Even if the Second Amendment may categorically exclude some individuals, it does not exclude Connelly. She does not fall within any of the groups mentioned in *Heller* that were subject to "longstanding prohibitions on the possession of firearms." *See* 554 U.S. at 626–27.[4] And while Connelly, like Rahimi, is "*suspected* of [ ] criminal conduct," the Government has produced no evidence showing Connelly has a prior felony or drug conviction on her record. *See Rahimi*, 61 F.4th at 452 (emphasis in original). Indeed, Connelly's suspected criminal conduct— using controlled substances on occasion in her home—pales in comparison to Rahimi's— instigating five separate shootings in just over a month. *Compare id.* at 448–49, *with* Compl. ¶¶ 10–11. If Rahimi can claim the Second Amendment's protection, then Connelly can as well.

### E.    Constitutionality of § 922(g)(3)

---

[4] *Heller*'s list of "longstanding prohibitions" does not "purport to be exhaustive." *Id.* at 626–27 & n.26. But as discussed below, the Court finds little evidence that a categorical prohibition on the possession of firearms by drug users "is consistent with this Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2126. To be sure, the question of whether historical traditions can justify a categorical regulation is analytically distinct from the question of whether the Second Amendment protects a regulated category of people. But the two questions are closely related. *See Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting) ("[The two] approaches will typically yield the same result; one uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away."), *cited with approval in Rahimi*, 61 F.4th at 451–52. Therefore, for much the same reasons that our Nation's history does not justify the categorical disarmament of users of controlled substances, Connelly's alleged use of controlled substances does not put her, as an individual, outside the Second Amendment's scope.

### 1.     Conduct

Because Connelly personally falls within the Second Amendment's scope, the Court considers whether § 922(g)(3) unconstitutionally infringes on her right to keep and bear arms. Under *Bruen* and *Rahimi*, the Court must first decide whether § 922(g)(3) burdens conduct protected by the Second Amendment.  *See Bruen*, 142 S. Ct. at 2129–30; *Rahimi*, 61 F.4th at 453.  As in *Rahimi*, the challenged law prohibits Connelly from "possess[ing] . . . any firearm or ammunition," 18 U.S.C. § 922(g), and "'possession' is included within the meaning of 'keep'" as used in the Second Amendment. *Rahimi*, 61 F.4th at 454 (citing *Bruen*, 142 S. Ct. at 2134–35). The specific weapons Connelly is accused of possessing—rifles, handguns, a shotgun, and ammunition—also appear to be "'in common use[]' such that they fall within the scope of the amendment."  *See id.* at 454 (citing *Bruen*, 142 S. Ct. at 2143); Superseding Indictment 3–4 (listing weapons and ammunition allegedly possessed by Connelly).  Accordingly, § 922(g)(3) burdens conduct protected by the Second Amendment.

### 2.     Historical justification

Turning to *Bruen*'s second step, the Court must consider whether the Government has demonstrated that § 922(g)(3) "is consistent with this Nation's historical tradition of firearm regulation."  142 S. Ct. at 2126.  This standard does not require the Government to identify a "'historical *twin*'; rather, a 'well-established and representative historical *analogue*' suffices." *Rahimi*, 61 F.4th at 454 (quoting *Bruen*, 142 S. Ct. at 2133 (emphasis in *Bruen*)).  At bottom, "[t]he core question is whether the challenged law and proffered analogue are 'relevantly similar,'" especially regarding "*how* the challenged law burdens the right to armed self-defense, and *why* the law burdens that right."  *Id.* (quoting *Bruen*, 142 S. Ct. at 2132–33 (emphasis in *Bruen*)).

10

Connelly argues that a heightened "distinctly similar" standard should apply to her challenge.  Mot. Dismiss 8.  She bases this argument on *Bruen*'s observation that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."  142 S. Ct. at 2131 (emphasis added); *see also* Mot. Dismiss 6–8 (arguing that this passage requires a heightened standard of review).  But this language only illustrates the type of evidence courts might consider; it does not suggest the existence of a separate standard of review.  *Rahimi* supports this reading: It stated that the "core question" in evaluating Second Amendment challenges is "whether the challenged law and proffered analogue are 'relevantly similar,'" without mentioning cases where distinct similarity may be required.  *See* 61 F.4th at 454 (quoting *Bruen*, 142 S. Ct. at 2132).  Moreover, *Rahimi* applied the "relevantly similar" standard to § 922(g)(8)—a law involving domestic violence restraining orders—even though domestic violence is a societal problem that has existed since the founding era.  *See id.* at 454–61.

Therefore, the Government must demonstrate that § 922(g)(3) is "relevantly similar" to historical gun regulations in how and why it burdens the Second Amendment right.  *See id.* at 454.  The Government advances two arguments on this point.  First, it argues that § 922(g)(3) falls within a longstanding tradition of "restricting the firearms rights of those who become intoxicated."  Resp. 15–16.  Second, the Government argues that § 922(g)(3) falls within the broader tradition of disarming categories of individuals deemed dangerous, irresponsible, or unvirtuous.  *See id.* at 12–14, 16–20.

### a.    Laws on intoxication

The Government identifies two laws from the colonial era that regulated firearm use in relation to alcohol use.  Resp. 15.  The Government also identifies six laws from "the era following ratification of the Fourteenth Amendment in 1868" that regulated firearm use by intoxicated individuals.  *Id.* at 15–16.[5]

### i.    Colonial Virginia law

First, the Government cites a law enacted in colonial Virginia in 1655.  *Id.* at 15.  This law prohibited the "shoot[ing] any gunns at drinkeing (marriages and ffuneralls onely excepted) [sic]."  Act XII of March 10, 1655, 1655 Va. Laws 401, 401–02.

The Virginia law is not relevantly similar to § 922(g)(3) because it regulates firearms differently and for different reasons.  First, the laws differ with respect to why they regulated gun use.  The Virginia law focused on protecting the colony from potential attacks by Native Americans, noting that "the only means for the discovery of their plotts is by allarms, of which no certainty can be had in respect of the frequent shooting of gunns in drinking [sic]."  1655 Va. Laws at 401.  Relatedly, the Virginia law also aimed at conserving military resources, expressing concerns about the "beastly vice [of] spending much [gun]powder in vaine, that might be reserved against the comon enemie [sic]."  *Id.*

In contrast, the Gun Control Act of 1968—the law that first prohibited users of controlled substances from possessing firearms—aimed to "provide support to Federal, State, and local law enforcement officials in their fight against crime and violence" generally.  Pub. L. No. 90-618,

---

[5] The Government does not identify any historical laws that prevented marijuana users or other drug users from owning or using firearms.  *See generally* Resp.  Connelly suggests that this fact should settle the case in her favor.  *See* Mot. Dismiss 8.  But "somewhat abstracting the laws' justifications . . . strikes [the Court] as consistent with *Bruen*'s instruction that 'even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.'"  *Rahimi*, 61 F.4th at 460 n.10 (quoting *Bruen*, 142 S. Ct. at 2133).

§ 101, 82 Stat. 1213, 1213 (1968); *see also Scarborough v. United States*, 431 U.S. 563, 572 (1977) (describing the purpose of the Gun Control Act as "keep[ing] guns out of the hands of those who have demonstrated that 'they may not be trusted to possess a firearm without becoming a threat to society'" (quoting 114 Cong. Rec. 14773 (1968))).  Far from seeking to protect citizens from outside threats, the Gun Control Act sought to preserve domestic order by preventing violent crime.  Such concerns doubtless existed in the Virginia colony in 1655, but the Government has not cited any law that addressed those problems with restrictions on gun use.

But even if the laws' underlying purposes were deemed relevantly similar, they differ in how they regulate firearm use in two critical respects: the Virginia law prevented individuals from *using* firearms while *actively intoxicated*, while § 922(g)(3) prevents *users* of intoxicants from *possessing* firearms altogether.  *Compare* 1655 Va. Laws at 401–02, *with* 18 U.S.C. § 922(g)(3).  Though § 922(g)(3) requires some temporal nexus between a person's drug use and firearm possession, the law allows long gaps between the two.  *See United States v. Cook*, 970 F.3d 866, 879 (7th Cir. 2020) ("[A] person who routinely uses marijuana on weekends may violate section 922(g)(3) by possessing a firearm on a Tuesday or Wednesday."); 27 C.F.R. § 478.11 (stating that "[a]n inference of current use may be drawn from evidence" of a positive drug test, "provided that the test was administered within the past year").  Prohibiting individuals who have used drugs sometime in the last year from owning and keeping a firearm in their homes for self-defense is a much more burdensome infringement on the Second Amendment's "core protection," than preventing people from shooting their guns while intoxicated.  *See Heller*, 554 U.S. at 634–35.

To illustrate the point, consider an analogy to motor vehicles.  The Virginia law regulated guns in much the same way that modern driving-under-the-influence ("DUI") laws regulate cars:

it prevented individuals from using dangerous equipment while intoxication might impair their abilities and judgment.  Consider instead a law that would prevent individuals from possessing cars at all if they regularly drink alcohol on weekends.  Nobody would say that this hypothetical law is similar to DUI laws in how it regulates cars.  The hypothetical law's focus on possession, rather than use, of the vehicle imposes a much greater burden on drivers.  A similar distinction exists between § 922(g)(3) and the Virginia law.  The two laws, therefore, are not relevantly similar.

### ii.        Colonial New York law

Second, the Government cites a law enacted in colonial New York in 1771.  Resp. 15.  This law prohibited the "fir[ing] or discharge [of] any Gun, Pistol, Rocket, Cracker, Squib or other fire Work [sic]" in certain areas between December 31 and January 2.  Ch. 1501, 5 *Colonial Laws of New York* 244–45 (1894).  The law expired in 1773.  *Id.* at 244.

Like the Virginia law, this New York laws differs from § 922(g)(3) in why it burdens the Second Amendment right, albeit to a lesser extent.  The New York law addressed the "great Damages [ ] frequently done on . . . New Years Days, by persons going from House to House, with Guns and other Fire Arms and being often intoxicated with Liquor."  *Id.*  To some degree, this law focuses on maintaining public order and preventing firearm-related injuries, much like the Gun Control Act did.  But the New York law addressed the *specific* dangers posed by New Year's Eve partygoers in certain parts of the New York colony, rather than the *general* dangers posed by armed criminals across the country.  *Compare id.*, *with* Gun Control Act, Pub. L. No. 90-618, § 101, 82 Stat. at 1213.  The New York law thus bears a closer similarity to restrictions on the use of firearms "in sensitive places" than it does to categorical restrictions on firearm possession by classes of people.  *Cf. Heller*, 554 U.S. at 626–27 & n.26.

Furthermore, the New York law is not relevantly similar to § 922(g)(3) in how it regulated firearms.  To start, the New York law did not restrict the ability of intoxicated people to use firearms; it prevented anyone from using firearms in certain areas because many people there would be intoxicated during the New Year's holiday.  *See Colonial Laws of New York*, *supra*, at 244–45.  In that sense, the New York law imposed a greater restriction on firearm use than § 922(g)(3).  But the broader applicability of the New York law was tempered by the fact that it only prohibited the use of firearms for three days out of the year.  *Id.*  And much like the Virginia law, the New York law limited the regulated activity to gun use, rather than gun possession.  *Id.* at 245.  Unlike § 922(g)(3), the New York law thus left ample room for individuals to keep guns in their homes for self-defense, even during the holiday period.  *Cf. Heller*, 554 U.S. at 632 ("It is inconceivable that [the New York] law would have been enforced against a person exercising his right to self-defense on New Year's Day against such drunken hooligans.").

Finally, any slight similarities between the New York law and § 922(g)(3) do not establish that § 922(g)(3) "is consistent with this Nation's historical tradition of firearm regulation."  *See Bruen*, 142 S. Ct. at 2126.  As one district court has pointed out, the New York law "was in effect for only two years, applied to only certain places in one county and two towns, and restricted the discharge of firearms for only three days a year."  *United States v. Harrison*, --- F. Supp. 3d ----, 2023 WL 1771138, at *9 (W.D. Okla. Feb. 3, 2023).  And the Government cites no laws that bear even a passing resemblance to the New York law that were enacted between 1771 and 1868.  *See* Resp. 15–16.  Thus, "it is difficult to see how [the New York] law could indicate any sort of 'well-established,' constitutionally relevant tradition of regulation."  *Harrison*, 2023 WL 1771138, at *9 (footnote omitted) (quoting *Bruen*, 142 S. Ct. at

2133); *see also Bruen*, 142 S. Ct. at 2142 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation." (emphasis in original)).

### iii.     Reconstruction-era laws

In addition to the two colonial laws, the Government cites six Reconstruction-era laws that regulated firearm use by intoxicated individuals.  *See* Resp. 15–16.  From the outset, the Court questions the persuasiveness of these laws.  As *Bruen* observed:

> [W]hen it comes to interpreting the Constitution, not all history is created equal. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." . . .  The Second Amendment was adopted in 1791; the Fourteenth in 1868.  Historical evidence that long predates [or postdates] either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years.

142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634–35 (emphasis in *Bruen*)).  While *Bruen* considered evidence from the mid-nineteenth century, *see id.* at 2150–53, it only did so because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was . . . the same *with respect to public carry*," *id.* at 2138 (emphasis added).  Elsewhere, courts generally assume that "the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 2137.

Here, the Court has even less reason to consider Reconstruction-era evidence than the *Bruen* Court did.  *Bruen* involved a state firearm regulation, and states are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Id.*  But § 922(g)(3) is a federal law, and the Second Amendment has applied against the federal government since the ratification of the Bill of Rights in 1791.  Accordingly, the Government's "appeals to Reconstruction-era history [may] fail for the independent reason that this evidence is

simply too late." *Id.* at 2163 (Barrett, J., concurring) (citing *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258–59 (2020)). Tellingly, when *Rahimi* analyzed a federal law under *Bruen*'s standard, it spent little time discussing Reconstruction-era laws. *See* 61 F.4th at 456–61.[6]

Even assuming that these Reconstruction-era laws can inform the original public understanding of the Second Amendment, they do not suffice to establish the constitutionality of § 922(g)(3). These laws suffer from much the same problems as the colonial laws discussed above: they prevented individuals from using or carrying firearms while intoxicated, rather than preventing users of intoxicants from possessing firearms at all. *Compare* 18 U.S.C. § 922(g)(3), *with* 1899 S.C. Acts 97, § 1 (forbidding the "discharge [of] any gun, pistol, or other firearms . . . within fifty yards of any public road" while "under the influence of intoxicating liquors"); 1890 Okla. Sess. Laws 495, art. 47, § 4 (prohibiting public officers from carrying arms "while under the influence of intoxicating drinks"); 1883 Wis. Sess. Laws 290, § 3 (making it "unlawful for any person in a state of intoxication, to go armed with any pistol or revolver"); 1883 Mo. Laws 76, § 1 (making it unlawful to "have or carry [firearms] upon or about [one's] person when intoxicated or under the influence of intoxicating drinks"); *and* Kan. Gen. Stat., Crime & Punishments § 282 (1868) (prohibiting "any person under the influence of intoxicating drink" from "carrying on his person a pistol . . . or other deadly weapon").[7] These laws thus

---

[6] *Rahimi* discussed a "going armed" law enacted in Virginia in 1847, but only to note that the legislature altered the law two years later. *See id.* at 458 & n.8. *Rahimi* also observed in a footnote that "ten jurisdictions enacted surety laws between 1836 and 1871." *Id.* at 459 n.9 (citing *Bruen*, 142 S. Ct. at 2148). But the opinion focused its analysis of surety laws on statutes codified "before ratification of the Bill of Rights or in early decades thereafter." *Id.* at 459–60 & n.9.

[7] The Government also cites an 1878 Mississippi law that regulated the sale of firearms, rather than the use or carrying of firearms. Resp. 15 (citing 1878 Miss. Laws 175–76, § 2). But this law still only applied to cases where the seller knew the customer was "in a state of intoxication." 1878 Miss. Laws 175–76, § 2.

regulated firearms in a much less intrusive way than § 922(g)(3), making them relevantly dissimilar.

To summarize, the historical intoxication laws cited by the Government generally addressed *specific* societal problems with *narrow* restrictions on gun *use*, while § 922(g)(3) addresses *widespread* criminal issues with a *broad* restriction on gun *possession*.  The laws, therefore, are not relevantly similar in how and why they regulate firearms, and do not suffice to establish the constitutionality of § 922(g)(3).

### b.    Broader categorical restrictions

In addition to its appeal to historical laws regarding intoxication, the Government argues that § 922(g)(3) falls within broader—and more abstract—traditions of gun regulation, which include disarming "potentially dangerous groups," "citizens who are not law-abiding and responsible," "unvirtuous . . . citizens," and "presumptively risky people."  *See* Resp. 12–18. Because drug users fall within some or all of these groups, the Government argues, § 922(g)(3) is constitutional.  *See id.* at 11–20.[8]

### i.    "Unvirtuous" individuals

The Court questions the applicability of these broader traditions to Connelly specifically, and drug users generally.  First, it is unclear whether legal authorities at the founding era would consider Connelly's homebound drug use "unvirtuous."  Colonial-era jurist William Blackstone, for example, drew a distinction between "public and private vices," with the former amenable to

---

[8] District courts in the Fifth Circuit have upheld § 922(g)(3) against Second Amendment challenges post-*Bruen*, largely employing these broader traditions.  *See United States v. Black*, --- F. Supp. 3d ----, 2023 WL 122920, at *3–4 (W.D. La. Jan. 6, 2023); *United States v. Sanchez*, --- F. Supp. 3d ----, 2022 WL 17815116, at *3 (W.D. Tex. Dec. 19, 2022); *United States v. Daniels*, 610 F. Supp. 3d 892, 895–97 (S.D. Miss. 2022).  The Court respectfully disagrees with these cases for the reasons detailed below.  Further, the Court notes that all three of these cases predated the Fifth Circuit's decision in *Rahimi*, which cast doubt on the applicability of these broader historical traditions to § 922(g)(3).  *See* 61 F.4th at 450–51, 453.

the "punishments of human tribunals," and the latter subject only to "eternal justice."  4 William

Blackstone, *Commentaries on the Laws of England* 42 (1769).  Notably, Blackstone opined that

"the vice of drunkenness, if committed privately and alone, is beyond the knowledge and of

course beyond the reach of human tribunals: but if committed publicly, in the face of the world,

[its] evil example makes it liable to temporal censures."  *Id.* at 41–42.  Connelly's alleged drug

use more resembles private drinking than public drunkenness, casting doubt on the idea that

history supports criminalizing or disarming her for this behavior.  And more generally, nothing

in § 922(g)(3) limits its applicability to public dangers or active intoxication, putting it out of

step with colonial-era attitudes.  *Cf. Rahimi*, 61 F.4th at 457 (distinguishing historical laws aimed

generally at the "preservation of political and social order" from modern laws aimed at

addressing specific issues).

## ii.    Individuals who are "not law-abiding"

Second, history does not support disarming Connelly because she is "not law-abiding."

Certainly, Connelly's alleged drug use, if proven, would violate federal law.  *See* 21 U.S.C.

§ 844.  But "no one even today reads [Second Amendment history] to support the disarmament

of literally all criminals, even nonviolent misdemeanants."  *Kanter*, 919 F.3d at 456 (Barrett, J.,

dissenting); *see also Rahimi*, 61 F.4th at 460 n.11 ("There is simply no tradition—from 1791 or

1866—of prohibiting gun possession . . . for people convicted of misdemeanors." (quoting David

B. Kopel & Joseph G. S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St.

Louis L.J. 193, 244 (2017) (cleaned up)).  *Rahimi* reinforced this observation when it rejected

attempts to limit the Second Amendment to "law-abiding" individuals:

> Under the Government's reading, Congress could remove "unordinary" or
> "irresponsible" or "non-law-abiding" people—however expediently defined—
> from the scope of the Second Amendment.  Could speeders be stripped of their

right to keep and bear arms?  Political nonconformists?  People who do not recycle or drive an electric vehicle?  One easily gets the point: Neither *Heller* nor *Bruen* countenances such a malleable scope of the Second Amendment's protections.

*Id.* at 453.

It follows that any historical tradition of disarming "unlawful" individuals does not support disarming Connelly for her alleged marijuana use.  Under federal law, Connelly's alleged simple marijuana possession would subject her to a misdemeanor charge at most.  *See* 21 U.S.C. § 844.[9]  And even if Connelly were convicted of simple marijuana possession, that conviction would be expunged by the blanket presidential pardon of all such marijuana possessions that, like Connelly's, took place before October 6, 2022.[10]

Connelly could face more serious charges for her alleged possession of psilocybin.[11] Simple possession of psilocybin would likely still be charged as a misdemeanor under federal law.  *See* 21 U.S.C. § 844.  But possession of psilocybin can support a felony charge under Texas law.  Tex. Health & Safety Code §§ 481.103(a)(5)(B), 481.116(b)–(e).  And if Connelly were

---

[9] Section 844 provides for felony simple possession charges if the individual has a prior drug-related conviction.  *See* 21 U.S.C. § 844(a).  And possession of large amounts of marijuana can give rise to a felony charge under Texas law.  Tex. Health & Safety Code § 481.121(b)(3)–(6).  But neither case is presented here.  The Government has not alleged that Connelly has *any* convictions on her record, let alone a prior drug conviction.  And Connelly possessed thirty grams—or just over one ounce—of marijuana or marijuana-related products at most.  *See* Compl. ¶ 12.  This quantity would not support a felony charge under Texas law.  *See* Tex. Health & Safety Code § 481.121(b)(1).

[10] Joseph R. Biden, Jr., *A Proclamation on Granting Pardon for the Offense of Simple Marijuana Possession*, The White House (Oct. 6, 2022), *available at* https://www.whitehouse.gov/briefing-room/presidential-actions/2022/10/06/granting-pardon-for-the-offense-of-simple-possession-of-marijuana/.

[11] It remains unclear from the briefing whether the Government alleges that Connelly is an unlawful user of psilocybin.  Some testimony tends to suggest that the psilocybin belonged to Connelly's husband, not her.  *See* Resp. 3 ("[Connelly's neighbor] further admitted that he believed [Connelly's husband] had ingested 'mushrooms' on the night of December 27th.").  Still, officers found the suspected psilocybin in a house shared by Connelly and her husband.  *See id.* at 4, 9–10.  And the Court must construe the facts in the light most favorable to the Government in order to resolve Connelly's Motion to Dismiss at this stage. Therefore, the Court assumes that Connelly possessed the suspected psilocybin in her house.

convicted in Texas state court of possessing the 37.74 grams of psilocybin found in her home, she would face at least two years in prison. *See* Compl. ¶ 12; Tex. Health & Safety Code § 481.116(d); Tex. Penal Code § 12.33. A person with such a conviction could be prohibited from possessing a gun indefinitely under other provisions of federal law. *See* 18 U.S.C. §§ 921(a)(20)(B), 922(g)(1).

But this only illustrates the overriding difficulty with the Government's argument that § 922(g)(3) merely disarms unlawful individuals: Connelly has not been convicted of—or even charged with—a drug crime. The longstanding prohibition on possession of firearms by felons requires the Government to charge and convict an individual *before* disarming her. *See* 18 U.S.C. § 922(g)(1). *Rahimi* stressed the importance of this pre-deprivation process: "[C]riminal proceedings have afforded the accused substantial protections throughout our Nation's history. In crafting the Bill of Rights, the Founders were plainly attuned to the preservation of these protections." 61 F.4th at 455 n.7.[12] But § 922(g)(3) does not provide for *any* pre-deprivation process, criminal or otherwise. The Government does not need to conduct a hearing or make any offer of proof before it deems someone an "unlawful user" of controlled substances and disarms her under § 922(g)(3). This lack of process makes § 922(g)(3) an "outlier in our legal tradition." *Harrison*, 2023 WL 1771138, at *9.[13]

---

[12] At least two district courts that have applied *Rahimi* within the Fifth Circuit have also noted the importance of these criminal safeguards. *See United States v. Mason*, No. 3:23-cr-36-P, 2023 WL 2589395, at *2 (N.D. Tex. Mar. 21, 2023) (distinguishing *Rahimi*'s holding from a challenge to § 922(g)(1) because the law considered in *Rahimi* "prohibits firearm possession by a class of persons . . . not *yet* convicted of a felony" (emphasis in original)); *United States v. Porter*, Criminal Action No. 22-277, 2023 WL 2527878, at *3 (W.D. La. Mar. 14, 2023) (upholding § 922(g)(9) in part because it "specifically contemplates people like Porter who were subject to criminal proceedings and a conviction").

[13] Section 922(g)(3) is similarly distinguishable from prohibitions on the possession of firearms by the mentally ill. Though the modern version of this prohibition does not provide criminal safeguards, it still requires some degree of pre-deprivation process. *See* 18 U.S.C. § 922(g)(4) (prohibiting gun possession

Of course, if the Government chooses to prosecute an individual under § 922(g)(3), it will have to prove beyond a reasonable doubt that the individual is an unlawful user of controlled substances.  But this process is only afforded "to a tiny fraction of those whose rights have been stripped—those that the United States has selected for prosecution and punishment."  *Id.*  For everyone else—including the millions of individuals who use marijuana in states that have legalized the practice—§ 922(g)(3) categorically prevents them from owning a firearm without a hearing or any preliminary showing from the Government.  They must choose to either stop their marijuana use, forgo possession of a firearm, or continue both practices and face up to fifteen years in federal prison.  *See* 18 U.S.C. §§ 922(g)(3), 924(a)(8).

In short, the historical tradition of disarming "unlawful" individuals appears to mainly involve disarming those convicted of serious crimes after they have been afforded criminal process.  Section 922(g)(3), in contrast, disarms those who engage in criminal conduct that would give rise to misdemeanor charges, without affording them the procedural protections enshrined in our criminal justice system.  The law thus deviates from our Nation's history of firearm regulation.

### iii.    "Dangerous" individuals

Finally, the Government attempts to analogize § 922(g)(3) to laws restricting the Second Amendment rights of "dangerous" groups.  Many of laws cited by the Government on this topic resemble the laws that the Fifth Circuit considered and distinguished from § 922(g)(8) in *Rahimi*.  *Compare* Resp. 12–15 & n.3, *with Rahimi*, 61 F.4th at 456–60.  The Court finds the Government's examples distinguishable from § 922(g)(3) for similar reasons.

---

by anyone "who has been *adjudicated* as a mental defective or who has been *committed* to a mental institution" (emphasis added)).  The same cannot be said for § 922(g)(3).

To start, historical laws disarming dangerous individuals differed slightly in their justifications from § 922(g)(3).  As *Rahimi* acknowledged, many of the colonial and early American laws that disarmed individuals targeted those who refused to take an oath of allegiance, or "breakers of the peace" that "go armed offensively."  *See* 61 F.4th at 456–57. *Rahimi* held that these laws were "aimed at curbing terroristic or riotous behavior, i.e., disarming those who had been adjudicated to be a threat to society generally, rather than to identified individuals."  *Id.* at 459.  They could not justify § 922(g)(8), because it disarmed anyone subject to a domestic restraining order, including many who pose no threat of "terroristic or riotous behavior."  *Id.*  Similarly, these laws do not support the constitutionality of § 922(g)(3), which disarms not just dangerous drug users, but all drug users.[14]

Moreover, historical firearm laws differed from § 922(g)(3) in how they disarmed dangerous individuals.  The colonial and early American "going armed" laws discussed in *Rahimi*, for example, only "disarmed an offender after criminal proceedings and conviction."  *Id.* at 458.  The "going armed" laws cited in the Government's briefing contain similar conditions. *See* Resp. 13 n.2 (first citing *Acts and Laws of His Majesty's Province of New Hampshire in New England* 17 (1771) (reprinting a 1701 statute that allowed a justice of the peace to "cause [an offender's] arms or weapons to be taken away" upon "legal proof" that the offender was a "disturber or breaker of the peace, or any other that [went] armed offensively"); and then citing

---

[14] Alternatively, some of these historical laws may have simply restricted the gun rights of those outside the political community at the time.  *See id.* at 456–57 (observing that colonial gun restrictions imposed on "those unwilling to take an oath of allegiance, slaves, and Native Americans" may have reflected "their perceived lack of loyalty or societal status").  This reading can similarly distinguish longstanding firearm restrictions on felons, minors, and the mentally ill from § 922(g)(3), since such groups were historically excluded from the right to vote—and, perhaps by extension, other civic rights.  *See* Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1868) (noting that "the infant, . . . the idiot, the lunatic, and the felon" were excluded from "the elective franchise").

*Collection of All Such Acts of the General Assembly of Virginia* 33 (1794) (reprinting a 1786 statute that prohibited "rid[ing] armed . . . in terror of the Country, upon pain of being arrested and committed to prison by any Justice on his own view . . . and in like manner forfeit his armour [sic] to the Commonwealth")).[15]  These "going armed" laws thus contained the necessary criminal safeguards that *Rahimi* emphasized—and that § 922(g)(3) lacks.  *Cf. Porter*, 2023 WL 2527878, at *3 (finding that the "going armed" laws discussed in *Rahimi* could be properly analogized to § 922(g)(9), which requires a conviction).

Finally, even if history broadly supports disarming dangerous individuals, there is little evidence that Connelly herself is dangerous.  The Government has not alleged that she committed any violent or threatening acts.  Instead, its core allegation is that she possessed and used marijuana.  But over twenty states have legalized the recreational use of marijuana,[16] and millions of U.S. citizens regularly use the substance.[17]  It strains credulity to believe that taking part in such a widespread practice can render an individual so dangerous or untrustworthy that they must be stripped of their Second Amendment rights.  As one district court observed when holding § 922(g)(3) unconstitutional as applied to marijuana users:

---

[15] The Government also cites two early American "going armed" laws that did not specifically provide for disarmament as a punishment but required the offender to post sureties.  *See id.* (first citing 2 *Laws of the Commonwealth of Massachusetts, from November 28, 1780 to February 28, 1807*, at 653 (1807) (1795 statute); and then citing *A Compilation of the Statutes of Tennessee of a General and Permanent Nature, from the Commencement of the Government to the Present Time* 99–100 (1836) (1801 statute)).  Even assuming that a failure to post sureties could result in disarmament, these laws resemble modern firearm restrictions even less than the two laws discussed above, and therefore cannot historically justify § 922(g)(3).  *See Rahimi*, 61 F.4th at 460 ("Where the surety laws imposed a conditional, partial restriction on the Second Amendment right, § 922(g)[] works an absolute deprivation of the right.").

[16] Claire Hansen et al., *Where Is Marijuana Legal? A Guide to Marijuana Legalization*, U.S. News & World Report (Mar. 16, 2023), https://www.usnews.com/news/best-states/articles/where-is-marijuana-legal-a-guide-to-marijuana-legalization.

[17] *See* Justin McCarthy, *What Percentage of Americans Smoke Marijuana?*, Gallup (Aug. 15, 2022), https://news.gallup.com/poll/284135/percentage-americans-smoke-marijuana.aspx (noting that sixteen percent of Americans report smoking marijuana).

24

> [T]he mere use of marijuana does not indicate that someone is in fact dangerous, let alone analogous to a "dangerous lunatic." There are likely nearly 400,000 Oklahomans who use marijuana under state-law authorization. Lumping all those persons into a category with "dangerous lunatics," as the United States' theory requires, is a bridge too far.

*Harrison*, 2023 WL 1771138, at *18.

Thus, the Government has failed to carry its burden to demonstrate that § 922(g)(3) is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Section 922(g)(3) breaks with historical intoxication laws by prohibiting not just firearm use by those who are actively intoxicated but also firearm possession by those who use controlled substances, even somewhat irregularly. And it breaks with broader historical traditions of gun regulation by disarming individuals without any sort of pre-deprivation process. Count One of the Indictment is therefore dismissed.

### F.    Constitutionality of § 922(d)(3)

Connelly also argues that § 922(d)(3)—the law giving rise to Count Two of her indictment—is unconstitutional under *Bruen*. Mot. Dismiss 10. This section makes it "unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person . . . is an unlawful user of or addicted to any controlled substance." 18 U.S.C. § 922(d)(3).

#### 1.    Conduct

At first blush, § 922(d)(3) may not appear to burden conduct protected by the Second Amendment. The Second Amendment protects the right to "keep and bear arms," i.e., "the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. The Amendment makes no mention of a right to "sell or otherwise dispose of" firearms. Indeed, *Heller* described "conditions and qualifications on the commercial sale of arms" as

25

"presumptively lawful regulatory measures." *Id.* at 627 & n.26; *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (reiterating the "presumptively lawful" status of commercial firearm regulations). In that vein, district courts have upheld federal laws regulating the commercial sale of firearms since *Bruen* became law. *See, e.g.*, *United States v. Flores*, --- F. Supp. 3d ----, 2023 WL 361868, at *2–5 (S.D. Tex. Jan. 23, 2023) (upholding § 922(a)(1)(A)— which requires firearms dealers to be licensed—against a Second Amendment challenge).

But some district courts have also acknowledged that the right to "keep and bear arms" necessarily entails other concomitant rights. Most notably, three district courts have concluded that the Second Amendment creates an implied right to "receive" firearms when analyzing Second Amendment challenges under *Bruen*. *See United States v. Simien*, --- F. Supp. 3d ----, 2023 WL 1980487, at *6 (W.D. Tex. Feb. 10, 2023); *United States v. Hicks*, --- F. Supp. 3d ----, 2023 WL 164170, at *2–3 (W.D. Tex. Jan. 9, 2023); *Quiroz*, 2022 WL 4352482, at *3–4. These courts reasoned that "[r]eceipt is the condition precedent to possession—the latter is impossible without the former." *Hicks*, 2023 WL 164170, at *2; *Quiroz*, 2022 WL 4352482, at *3; *accord Simien*, 2023 WL 1980487, at *6. One of these courts extended this logic to restrictions on the sale of firearms, noting that if the Second Amendment right were strictly limited to possession, "Congress could throttle gun ownership without implicating Second Amendment scrutiny by just banning the buying and selling of firearms." *Hicks*, 2023 WL 164170, at *2.

There is no Fifth Circuit authority on whether § 922(d)(3) falls within the scope of the Second Amendment, and pre-*Bruen* authority from other circuits is split. In an unpublished opinion, the Fourth Circuit found that § 922(d)(3) did not burden Second Amendment conduct, noting that "although the Second Amendment protects an individual's right to bear arms, it does not necessarily give rise to a corresponding right to sell a firearm." *United States v. Chafin*, 423

F. App'x 342, 344 (4th Cir. 2011) (citing *United States v. 12 200-Foot Reels of Super 8mm.*

*Film*, 413 U.S. 123, 128 (1973)).  For its part, the Ninth Circuit has found that § 922(d)(3) did

burden conduct protected by the Second Amendment: "[B]y preventing [the plaintiff] from

purchasing a firearm, 18 U.S.C. § 922(d)(3) . . . directly burden[s] her core Second Amendment

right to possess a firearm."  *Wilson v. Lynch*, 835 F.3d 1083, 1092 (9th Cir. 2016).

However, another Ninth Circuit decision, *Teixeira v. County of Alameda*, 873 F.3d 670

(9th Cir. 2017) (en banc), provides a compelling framework for analyzing this split in authority.

There, the court held that "the Second Amendment does not confer a freestanding right . . . upon

a proprietor of a commercial establishment to sell firearms," citing evidence of historical

restrictions on firearm sales and distribution.  *Id.* at 682, 684–87.  But *Teixeira* also held that the

Second Amendment protected the ancillary right to *acquire or purchase* a firearm, observing that

"the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean

much' without the ability to acquire arms."  *Id.* at 677 (quoting *Ezell v. City of Chi.*, 651 F.3d

684, 704 (7th Cir. 2011)).  Therefore, *Teixeira* observed that "permitting an overall ban on gun

sales 'would be untenable under *Heller*,' [ ] because a total prohibition would severely limit the

ability of citizens to *acquire* firearms."  *Id.* at 687 (emphasis in original) (citation omitted)

(quoting *United States v. Marzzarella*, 614 F.3d. 85, 92 n.8 (3d Cir. 2010), *abrogated on other*

*grounds by Bruen*, 142 S. Ct. at 2127).

*Teixeira* thus indicates that restrictions on the sale of firearms can burden conduct

protected under the Second Amendment, but only if they significantly burden the ability of

individuals to acquire firearms.  District courts within the Ninth Circuit have made this

observation, applying Second Amendment scrutiny to commercial restrictions that prevent or

restrict citizens from acquiring firearms.  *See Renna v. Becerra*, 535 F. Supp. 3d 931, 940–41

(S.D. Cal. 2021); *Altman v. Cnty. of Santa Clara*, 464 F. Supp. 3d 1106, 1122–23, 1125 (N.D. Cal. 2020).[18]

Applying this principle to the case at hand, the Court finds that § 922(d)(3) burdens conduct protected by the Second Amendment. The language of § 922(d) tracks the language of § 922(g) closely, prohibiting the transfer of firearms to each group that cannot lawfully possess guns under § 922(g). *Compare* 18 U.S.C. § 922(d)(1)–(9), *with id.* § 922(g)(1)–(9). And § 922(d) applies to nearly all sales and transfers, allowing for almost no exceptions. *See id.* § 922(d). It follows that excluding § 922(d)(3) from Second Amendment scrutiny would create an end-run around the Court's holding on the constitutionality of § 922(g)(3). The Government could simply shift liability from those possessing guns to those providing guns, and the right of individuals to acquire firearms would be just as burdened as before. *Cf.* Resp. 19 (describing § 922(d)(3) as "a less direct way to restrict gun access to drug users"). Therefore, the conduct prohibited by § 922(d)(3) falls within the scope of the Second Amendment.

### 2.    Historical justification

The Government does not cite any additional historical laws that justify § 922(d)(3) specifically; it appears to argue that its evidence justifies § 922(g)(3) and (d)(3) for the same reasons. *See generally* Resp. 11–20. The Court has already discussed how the Government's historical evidence does not justify § 922(g)(3). Since § 922(d)(3) would impose nearly the same

---

[18] The Court is unaware of any Fifth Circuit case that has squarely addressed whether—or when—regulations on the sale or transfer of firearms fall under the Second Amendment's protection. But *Teixeira*'s approach to the problem appears consistent with language that the Fifth Circuit has used when analyzing commercial firearm regulations in pre-*Bruen* cases. *See Mance v. Sessions*, 896 F.3d 699, 711 (5th Cir. 2018) (upholding an "in-state sales requirement" against a Second Amendment challenge because the plaintiffs were "not prohibited by the federal laws from purchasing and possessing handguns"); *Nat'l Rifle Ass'n of Am., Inc. v. ATF*, 700 F.3d 185, 206–07 (5th Cir. 2012) (evaluating the constitutionality of a law restricting sales of firearms to minors against the ability of "18-to-20-year-olds [to] possess[] and us[e] handguns in defense of hearth and home" (cleaned up)).

restrictions on firearm use as § 922(g)(3), it follows that the same historical evidence cannot justify either law.

The Court briefly discusses two points that distinguish Connelly's § 922(d)(3) challenge from her § 922(g)(3) challenge. First, § 922(d)(3) does not directly burden Connelly's individual Second Amendment right. As explained above, § 922(d)(3) merits Second Amendment scrutiny because it burdens the right of individuals to acquire firearms. But as applied in this case, § 922(d)(3) prohibited Connelly's husband from acquiring a firearm. The law thus placed a burden on the Second Amendment rights of Connelly's husband, even though it resulted in Connelly herself being prosecuted.[19] The Government has not argued that Connelly lacks standing to assert her husband's constitutional rights as a defense to the § 922(d)(3) charge. *See generally* Resp. And considering the issue sua sponte, the Court finds that it is proper to "consider whether the statute under which the defendant has been charged lacks constitutional application to her conduct. . . . even where the constitutional provision that would render [a] conviction void is directed at protecting a party not before the Court." *Bond v. United States*, 564 U.S. 211, 227 (2011) (Ginsburg, J., concurring); *see also Teixeira*, 873 F.3d at 678 ("[V]endors and those in like positions have been uniformly permitted to resist efforts at

---

[19] The Court is concerned that, as charged here, § 922(d)(3) may also infringe upon Connelly's individual Second Amendment rights. Connelly argues that "[t]he Government's [§ 922(d)(3)] theory in this case appears to be that [she] had a duty to prevent her husband from accessing their firearms in her home." Mot. Dismiss 10–11. If the Government were to proceed on this theory of § 922(d)(3) culpability, it would substantially burden Connelly's right to possess firearms in her home. If a person can "sell or otherwise dispose of" a firearm to their spouse by simply storing the weapon in a home that the two share, then that person would be exposed to felony liability under § 922(d)(3) for owning a gun while being married to a user of controlled substances. This expansive theory of liability would force Connelly to choose between her fundamental right to keep and bear arms and her fundamental right to "marry [and] establish a home" with her spouse. *See Obergefell v. Hodges*, 576 U.S. 644, 668 (2015) (quoting *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978)). But for the purposes of this Motion, the Court assumes without deciding that only Connelly's husband's Second Amendment right—and not her own—is implicated by Count Two of the Indictment.

restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." (quoting *Craig v. Boren*, 429 U.S. 190, 195 (1976) (cleaned up))).

Second, the criminal acts allegedly committed by Connelly's husband go well beyond Connelly's own alleged criminal conduct.  Connelly and her neighbor both told police officers that Connelly's husband had used cocaine during the days leading up to the shooting incident. Resp. 3–4.  Connelly's neighbor also suggested that Connelly's husband used "mushrooms" the night before the shooting.  *Id.* at 3.  And more to the point, Connelly's husband allegedly fired at his neighbor's door with a shotgun because of "an argument between [Connelly] and her husband [ ] over his drug use with their neighbor."  *Id.* at 1, 4.  Thus, Connelly's husband appears to be the type of dangerous individual that historical authorities may have disarmed, weakening Connelly's as-applied challenge to § 922(d)(3).

But Connelly also raises a facial challenge to § 922(d)(3).  *See* Mot. Dismiss 3, 10.  And *Rahimi* explained that "if a statute is inconsistent with the Second Amendment's text and historical understanding, then it falls under any circumstances," and a court must sustain a facial challenge to the law.  *See Rahimi*, 61 F.4th at 453 (citations omitted).  The facts of *Rahimi* confirm this reading.  Rahimi himself obviously posed a danger to society at large; he allegedly instigated five separate shooting incidents in just over a month.  *See id.* at 448–49.  If it were proper to save § 922's constitutionality as applied to dangerous individuals, the Fifth Circuit could have easily done so and sustained Rahimi's conviction.  But instead, the *Rahimi* court compared the terms of § 922(g)(8) to the text and history of the Second Amendment and found the law unconstitutional on its face.  *See id.* at 454–61.

Here, Connelly's husband may pose a danger to the public similar to the one posed by Rahimi.  But § 922(d)(3), as written, also effectively disarms individuals who do not pose the

same kind of threat.  Moreover, § 922(d)(3) does not tie its restrictions on gun use to intoxication or public safety in the way that historical gun regulations did.  Nor does it provide the pre-deprivation process that laws disarming dangerous individuals historically required.  Thus, even if Connelly's husband poses enough of a danger to society that the Government can lawfully disarm him, it cannot use § 922(d)(3) as a vehicle for doing so.  As the *Harrison* court observed, "[T]he Nation's historical tradition of firearm regulation demonstrates that Congress may disarm those who have demonstrated a proclivity for violence . . . .  Harrison may well have such a proclivity, but the mere fact that he uses marijuana does not tell us that."  2023 WL 1771138, at *17.

In sum, § 922(d)(3) does not withstand Second Amendment scrutiny for much the same reasons that § 922(g)(3) does not.  The law's broad prohibition on the sale or transfer of firearms to unlawful users of controlled substances burdens the Second Amendment rights of those individuals to nearly the same extent as § 922(g)(3).  And, as the Court found when assessing § 922(g)(3), our Nation's historical tradition of firearm regulation does not support placing such a burden on the Second Amendment right.  Accordingly, Count Two of the Indictment is also dismissed.

## IV.  CONCLUSION

For the foregoing reasons, Connelly's Motion to Reconsider, ECF No. 86, is **GRANTED**.  The Court **ORDERS** that the offenses charged in Counts One and Two of the Superseding Indictment, ECF No. 44, are **DISMISSED**.

31

**SO ORDERED.**

SIGNED this 6th day of April, 2023.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE